DANIEL A. PARDE, APPELLANT, V. LORALEE A. PARDE, APPELLEE.

591 N.W. 2d 783

Filed April 6, 1999.   No. A-97-985.

David P. Lepant and Reggie L. Ryder, of Andersen & Lepant, for appellant.

James E. Gordon and Kevin T. Lytle, of DeMars, Gordon, Olson and Shively, for appellee.

MUES, INBODY, and CARLSON, Judges.

MUES, Judge.

## INTRODUCTION

Daniel A. Parde appeals from the decree of dissolution entered by the district court for Gage County, challenging the district court's finding that the unpaid portion of his Federal Employers' Liability Act (FELA) settlement should be included in the marital estate and divided equally. Finding that the district court abused its discretion in failing to exclude the remaining settlement proceeds from the marital estate, we modify the decree accordingly.

## BACKGROUND

Daniel and Loralee A. Parde were married on December 11, 1976, they separated on January 5, 1997, and the dissolution decree was entered on August 11, 1997. Three children were born of the marriage. At the time of the divorce trial, their ages were 19, 15, and 12.

The divorce hearing was held on June 13, 1997. The record shows the following: During the marriage, Daniel worked 16 years for Burlington Northern Railroad Company. He was injured on three separate occasions in 1989 and 1990. As a

result of these injuries to his lower back, he negotiated a settlement with Burlington, which settlement is memorialized by a "General Release Agreement" (Release). According to the Release, in exchange for releasing Burlington from any and all claims and liabilities of every kind and nature resulting from these injuries, Daniel was to be paid $152,994 at the time of the Release and an additional $98,750 on September 1, 2002, for a total of $251,744. The Release provided that Burlington was to assign the obligation due in 2002 to SAFECO Assigned Benefits Corporation (SAFECO), which in turn would fund the obligation by purchasing an annuity owned and controlled by SAFECO, the $98,750 amount being payable notwithstanding Daniel's death.

Loralee worked at a variety of jobs during the marriage and had been working for American Tool for 8 years prior to the divorce proceedings. According to the child support calculations, she was earning approximately $24,800 per year at the time of the divorce. Daniel's earnings at the time of the divorce will be discussed later herein.

The primary issue below was whether the $98,750 amount remaining to be paid under the Release should be included in or excluded from the marital estate. Daniel sought to prove that it represented compensation for loss of future earnings and was thus excludable. The trial court found that the cash portion of the settlement received by Daniel in 1992 was already reflected in the other assets of the parties which were divided pursuant to their agreement. The parties stipulated to a nearly equal division of all other property, each receiving approximately $60,000 in net value. The district court approved the property settlement with exceptions not relevant to this appeal. Loralee was granted custody of the children subject to the reasonable visitation rights of Daniel. Daniel was ordered to pay child support in the amount of $567 per month for the two minor children residing with Loralee.

The district court found that the evidence failed to show any specific allocation of the settlement or any basis for determining that a portion of it was allocable to Daniel's loss of future earnings. It further found that the entire settlement, both cash and annuity, was based upon injuries received during the mar-

riage and upon income earned during the marriage. It concluded, "Lacking any foundation to allocate possible future earnings or Tier II benefits, the Court finds the entire settlement should be considered marital property." Therefore, the court found the remaining sum due from the settlement to be part of the marital estate and awarded Loralee 50 percent of the "annuity provided for" Daniel. Daniel appeals.

## ASSIGNMENT OF ERROR

Daniel assigns as error the district court's holding that the amount due under the annuity was marital property.

## STANDARD OF REVIEW

In actions for dissolution of marriage, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. This standard of review applies to the trial court's determinations regarding division of property, alimony, and attorney fees. *Davidson v. Davidson*, 254 Neb. 656, 578 N.W.2d 848 (1998).

A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrain from acting, but the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system. *Hoshor v. Hoshor*, 254 Neb. 743, 580 N.W.2d 516 (1998); *Tyler v. Tyler*, 253 Neb. 209, 570 N.W.2d 317 (1997); *Prochaska v. Prochaska*, 6 Neb. App. 302, 573 N.W.2d 777 (1998). In a review de novo on the record, an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions with respect to the matters at issue. *Tyler v. Tyler, supra*; *Pope v. Pope*, 251 Neb. 773, 559 N.W.2d 192 (1997); *Connealy v. Connealy*, 7 Neb. App. 117, 578 N.W.2d 912 (1998). When evidence is in conflict, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Davidson v. Davidson, supra*; *Thiltges v. Thiltges*, 247 Neb. 371, 527 N.W.2d 853 (1995); *Belitz v. Belitz, ante* p. 41, 587 N.W.2d 709 (1999); *Davis v. Davis*, 7 Neb. App. 78, 578 N.W.2d 907 (1998).

## DISCUSSION

Daniel argues that the district court abused its discretion in not setting aside to him the remaining portion of his personal injury settlement as his separate property. He alleges that only that portion of the award attributable to loss of income during the marriage is properly considered part of the marital estate. He argues that according to the evidence, the majority of the settlement amount was compensation for loss of future earnings and earning capacity.

Loralee argues that because the settlement was for personal injury, it was all includable in the marital estate. Alternatively, she contends the trial court was correct in including the unpaid balance in the marital estate because Daniel failed to meet his burden of proving that the annuity was nonmarital.

In the case of *Mathew v. Palmer, ante* p. 128, 589 N.W.2d 343 (1999), we recently addressed the proper approach to determining what portion of a personal injury recovery is included in the marital estate. Neither the trial court nor the parties had the benefit of our *Mathew* decision at the time of the proceedings below. In *Mathew*, we affirmed the trial court's finding that settlement proceeds from a wife's breach of privacy suit and the anticipated recovery from a suit involving the wife's personal injury were not part of the marital estate. In so concluding, we held that

> compensation for a tortious injury that a spouse has or will receive for pain, suffering, disfigurement, disability, or other debilitations of mind or body are not included in the marital estate, but compensation for past wages, medical expenses, and other items which diminish the marital estate are included within the marital estate.

*Id.* at 137, 589 N.W.2d at 351.

As support for our decision, we stated further:

> "Moneys realized by way of settlement or judgment from a tortfeasor as compensation for pain, suffering, disfigurement, disability, or other debilitation of the mind or body, represent personal property of the injured spouse and do not constitute a marital asset, although there is authority to the contrary. . . . But moneys realized in an action for personal injuries for past wages and medical

expenses, which diminished the marital estate, are marital assets. Thus, some portion of an award for a personal injury sustained during the marriage may constitute marital property subject to distribution, and the proper means to determine whether an award, or part of it, is marital property is to ask what the award was intended to replace, not merely to ask how the statute defines marital property." *Id.* at 136-37, 589 N.W.2d at 350 (quoting 24 Am. Jur. 2d *Divorce and Separation* § 546 (1998)).

This court had earlier addressed this topic in the context of a workers' compensation award. See *Gibson-Voss v. Voss*, 4 Neb. App. 236, 541 N.W.2d 74 (1995). To determine what portions of a workers' compensation award are marital property or separate property, a court must consider (1) the purpose of the award, e.g., whether it was made for lost earnings, loss of future earning capacity, or some other purpose; (2) the time period of any diminished earning potential or disability; (3) the nature and date of the underlying injury; and (4) the terms of the award. *Id.*

Although Loralee argues that FELA recoveries should be viewed differently than those based on workers' compensation laws, we believe the distinction is immaterial in view of the rationale of *Mathew v. Palmer, supra.* We fail to discern any valid reason why the approach should vary with the nature of the proceeding producing the recovery.

Based on the foregoing authorities, it is clear that not all judgment or settlement proceeds intended as compensation for damages due to a personal injury are marital property. Indeed, it is only the compensation for "past wages, medical expenses, and other items which diminish the marital estate" which is included. *Id.* at 137, 589 N.W.2d at 351. As with all nonmarital property, the burden of proof to show that property is nonmarital property is on the person making the claim. See, *Shockley v. Shockley*, 251 Neb. 896, 560 N.W.2d 777 (1997); *Mathew v. Palmer, supra.* With these principles in mind, we turn to our de novo examination of the evidence.

The Release, signed August 26, 1992, stated, inter alia, that in consideration for payment of $152,994 in cash and an annuity payable on September 1, 2002, in the amount of $98,750,

Daniel released Burlington from any and all claims and liability. The cash payment was allocated as follows: "TO TIME LOST . . . (for period of 7/1/92 through 5/31/96)"—$54,101.70, and "TO OTHER FACTORS"—$98,892.30. The total received from the $152,994 "cash" portion of the settlement was $148,364.16 after retirement taxes and a lien were deducted. In the agreement, Daniel was barred from ever returning to work for Burlington.

Lori Savidge testified that she was the Burlington claims representative that negotiated the settlement award with Daniel to resolve the claim he had made against the company for injuries he received to his lower back in 1989 and 1990. She testified, generally, that the purpose of the settlement was to resolve a claim that Daniel had made against Burlington and that the award was based on the liability risk, Daniel's injury, and "economic losses, such as past wage loss and future wage loss."

Savidge also explained that the portion of the original cash payment allocated to "time lost" was merely to qualify Daniel for railroad retirement because at the time of the settlement, he did not have enough creditable service months to earn retirement. Stated another way, she explained that the figure of $54,101.70 allocated to time lost from July 1, 1992, through May 31, 1996, was "merely to come up with what figure are we going to use to calculate what taxes need to be paid in order to get those creditable service months."

Savidge described economic loss as loss which "usually consists of past wage loss, which I don't remember the exact figure, and future loss of earning capacity." When asked how much of the settlement was based on economic loss, Savidge replied:

> I would say the majority of it. I would — I don't break it down, the figure, into so many dollars for future, so many dollars for pain and suffering, so many dollars for liability or contrib., but I can say the majority of it was based on the fact that he [Daniel] was not working for the railroad. He was a young man and disabled and he was going to lose some earnings down the road at least 20-some years.

Daniel testified that he was 40 years old at the time of the settlement, had been working at Burlington for 16 years 1 month,

and could have retired from Burlington at age 62. Daniel testified that he had not physically worked for Burlington since the "last working day in May of 1991." However, he continued to receive his regular pay until June 15, 1992. He also received a check for vacation pay after June 15. Daniel testified that he was earning between $30,000 and $31,000 when he left Burlington.

Due to the injuries Daniel received, Dr. Samuel Smith determined that Daniel was not able to return to work at Burlington. After the settlement, Daniel attended and graduated from Southeast Community College, which prepared him to become a respiratory therapist. Child support calculations show that at the time of trial he was making approximately $26,000 per year working as a respiratory therapist at Bryan Memorial Hospital. The record does not show the date of Daniel's graduation or when he was first employed following the date of the Release. Daniel testified that he continues to experience back pain requiring medical attention and causing loss of work as recently as February 1997. As a result of this episode, he recently reduced his hours of work.

In a review de novo on the record, an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions with respect to the matters at issue. *Tyler v. Tyler*, 253 Neb. 209, 570 N.W.2d 317 (1997); *Belitz v. Belitz, ante* p. 41, 587 N.W.2d 709 (1999). When the evidence is in conflict, the appellate court considers, and may give weight to, the fact that the trial court heard and observed the witness and accepted one version of the facts rather than another. *Thiltges v. Thiltges*, 247 Neb. 371, 527 N.W.2d 853 (1995).

The evidence as presented by the record before us is not in conflict. It is obvious from the district court's findings that they were not based upon its acceptance of one version of the facts rather than another. Instead, it concluded that Daniel's evidence did not provide a sufficient foundation for it to make an allocation of the FELA settlement or to determine whether the $98,750 remaining to be paid on Daniel's settlement should be considered his separate, nonmarital property. We believe the evidence establishes more than ample foundation to do both.

■ Before discussing the relevant evidence, it is helpful at this point to recall what elements of compensation for personal injuries constitute marital assets and which do not. Clearly, compensation for pain and suffering is the separate property of the injured person. See *Mathew v. Palmer, ante* p. 128, 589 N.W.2d 343 (1999). However, compensation for a loss of wages experienced during the marriage is included within the marital estate. See, *id.; Gibson-Voss v. Voss*, 4 Neb. App. 236, 541 N.W.2d 74 (1995). This is so because this compensation replaces a loss which diminished the marital estate. See *id.* However, to the extent that such a settlement compensates for loss of premarriage or postdivorce earnings of the injured party, it is that person's separate property. See *Gibson-Voss v. Voss, supra* (workers' compensation award is marital property only to extent award recompenses for couple's loss of income during marriage; to extent that it compensates for loss of premarriage or postdivorce earnings of injured party, it is separate property).

Savidge's undisputed testimony is that the purpose of Daniel's settlement with Burlington was to pay him compensation for three major components of damage: pain and suffering, past wage loss, and future wage loss or diminished earning capacity. Based upon the legal principles discussed above, only one of those three components could conceivably be considered a marital asset—past wages. In this instance, that component includes the portion of the $251,744 reasonably allocable to (1) wages due Daniel at the time of the settlement and (2) wage loss between the date of the settlement and the entry of the dissolution decree, in this case, August 11, 1997. The rest of the settlement, whether allocable to either pain and suffering or postdivorce earnings, was Daniel's separate property.

Our de novo review of the record discloses that at the time this settlement was made, Daniel was, at most, owed lost wages from mid-June to August 26, 1992, the date of the Release. Based upon a $30,000-per-year income with Burlington, wages for that period were roughly $6,250. Subtracting that sum from the total settlement figure of $251,744 leaves a remaining sum of $245,494 as compensation for future lost wages or pain and suffering as of the Release date.

However, the marriage continued for slightly more than 5 years after the settlement was made and before the August 1997 divorce decree. A portion of the remaining $245,494, to the extent that it represented "future" lost wages in August 1992, was obviously "past" lost wages by August 1997, when the divorce decree was entered. That portion certainly represents recompense to the marriage for loss of Daniel's wages. Thus, that portion must be deemed marital property. The question becomes, What is the appropriate amount attributable to that category?

Daniel and Burlington allocated the sum of approximately $54,000 for "time lost" for the time period from July 1, 1992, through May 31, 1996. Loralee argues on appeal that parol evidence should not be allowed to modify that agreement. At the same time, she asks that we ignore this allocation because the parol evidence offered through Savidge establishes that the allocation was not based upon reality. While Loralee's diametrically opposed positions are perplexing, for purposes of our review, we will address this issue considering both positions, alternatively.

If we accept the $54,000 allocation and additionally assume that Daniel earned no wages between May 31, 1996, and the date of the divorce decree (an assumption favoring Loralee as it is clear that at some point Daniel was reemployed), approximately another $35,000 would be attributable to lost wages, again based on a $30,000 annual income. This results in a total amount of lost wages for the period of July 1992 through August 1997 of roughly $89,000 ($54,000 plus $35,000), leaving approximately $156,500 of the total settlement remaining as compensation for Daniel's future losses as of the time of the divorce.

If we entirely ignore the Release's allocation of Daniel's lost wages for the stated time period, we reach a similar conclusion. At the time of this settlement, Daniel's worklife was approximately 22 years. If we simply divide the $245,494 balance remaining as of August 1992 by 22 years, thus attributing that entire amount to future lost wages and none of it to nonmarital pain and suffering, one arrives at a figure of slightly over

$11,000 per year. This establishes an annual figure designed to compensate for Daniel's lost earnings or diminished capacity from age 40 in August 1992 through age 62. At that rate, some $55,000 to $60,000 of the remaining compensation would be amortized over the approximately 5-year period the parties remained married after the Release date. Using the $60,000 figure, approximately $185,500 of the settlement remained as compensation for Daniel's postdivorce loss of wages or diminished earning capacity.

Interestingly, even if we assumed that Daniel had *no* earnings for the 5-year period in question and that a full $31,000 per year was lost to the marriage during that time, only $155,000 of the total settlement amount could be attributable to past lost wages as of the time of the decree. Such a hypothetical calculation is, of course, absurd in view of the evidence that Daniel *did* return to work as a respiratory therapist at some point in that 5-year period at the rate of $26,000 per year. But, even using such a hypothetical calculation, nearly $90,500 of the settlement would remain as compensation for Daniel's postdivorce lost earnings.

In his brief, Daniel suggests yet another method of viewing the evidence and the reasonable inference from it so as to conclude that the unpaid settlement sums should be considered as nonmarital property. Using any reasonable method, the evidence establishes, by a clear preponderance, that the remaining $98,750 must be considered Daniel's separate property.

The principles stated in *Mathew v. Palmer, ante* p. 128, 589 N.W.2d 343 (1999), and *Gibson-Voss v. Voss*, 4 Neb. App. 236, 541 N.W.2d 74 (1995), are clear in that a settlement which recompenses for damages which have diminished the marital estate—lost wages and/or medical expenses—are deemed marital property. The rationale is that but for such losses, the marital estate would, theoretically, be that much greater. However, to the extent such settlement compensates for losses which have not diminished the marital estate, it is separate property. In this case, the money received in August 1992 at the time the Release was signed—some $152,994, less taxes and a lien—went into the marriage and is now, according to the trial court's finding, reflected in the parties' remaining assets. That sum more than

adequately "recompensed" the estate, in advance, for any losses it might have suffered due to Daniel's lost wages during the marriage. Indeed, it might be argued that the estate has already received a windfall. To now find that the remaining $98,750 should also be considered part of the marital estate is clearly untenable and deprives Daniel of a substantial right and a just result. See *Hoshor v. Hoshor*, 254 Neb. 743, 580 N.W.2d 516 (1998). ·

In sum, after reappraising the evidence and reaching our own independent conclusions, see *Tyler v. Tyler*, 253 Neb. 209, 570 N.W.2d 317 (1997), we conclude that Daniel met his burden of proving that the remaining $98,750 is his separate property and should be set aside to him as such.

In reaching this conclusion, we have carefully considered what we understand to be Loralee's argument that Daniel failed to meet his burden of proof because he could not establish, by direct evidence, that the remaining unpaid amount through the annuity carried a specific designation showing it was for a nonmarital purpose. We do not believe such proof was a prerequisite to Daniel's meeting his burden. In this case, we view the settlement as a whole. By proving what portion of the entire settlement is to be reasonably considered as lost wages during the marriage and thus as a marital asset, Daniel has necessarily proved what portion should properly be viewed as nonmarital property.[^1]

We recognize that the evidence Daniel presented did not consist of a settlement document with a tidy breakdown of each dollar of the settlement into well-defined categories. Some settlements will provide such an allocation. For example, workers' compensation settlements customarily require formal applications which, inter alia, set forth the medical bills being paid, future medical payments taken into account, the weekly wage rate being paid, the specific wage period covered by the settlement, and a calculation purporting to commute those periodic wage payments into a lump sum amount pursuant to workers' compensation tables designed for that purpose. Awards in such cases are also generally well defined as to the elements of damages awarded. Of course, general damages for pain and suffering, disfigurement, et cetera are not involved in workers' com-

pensation cases. However, general personal injury settlements are seldom as precisely delineated. Nevertheless, when, as here, evidence is presented from which reasonable inferences can be drawn that preponderate in favor of an allocation, the fact that a specific allocation has not been made in the settlement documents or the award does not preclude finding that the award was intended to compensate for a particular purpose and the amount thereof. We believe the trial court placed too stringent a burden of proof on Daniel in this case.

## CONCLUSION

The district court abused its discretion in not setting aside to Daniel, as nonmarital property, the remaining $98,750 due under his settlement with Burlington. The court's decree must be, and is, modified to set that sum aside to Daniel as his sole and separate property.

AFFIRMED AS MODIFIED.